UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VANESSA MACKLIN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:09-cv-00130-LJM-TAB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
|     Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Vanessa Macklin ("Macklin"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), who found that Macklin was not entitled to Supplemental Security Income ("SSI"). The Court rules as follows.

## I. BACKGROUND

Macklin was born on December 14, 1972. R. at 78. She completed her GED in October 1991, and earned a paralegal specialist associate's degree in April 2003. R. at 119. Macklin also holds a certified nursing assistant certificate, and has taken nursing courses at Ivy Tech Community College and Martin University. R. at 119, 233, 410, 415. Macklin has been employed in a range of unskilled and semi-skilled jobs since 1993, including positions as a bakery clerk, a grocery store cashier, a home health aid, a nursing assistant, and a receptionist. R. at 29-32. The last substantial gainful employment Macklin

held was a job as a receptionist, doing work at the semi-skilled sedentary level.  R. at 52-53.

On April 21, 2005, Macklin filed an application for SSI, alleging a disability onset date of December 1, 2004.  R. at 114.  The application alleges that Macklin's depression, severe asthma, and supraventricular tachycardia[1] render her unable to work.  R. at 117.  Macklin was denied benefits initially and again after reconsideration.  R. at 14.  On March 24, 2008, Administrative Law Judge Ronald T. Jordan (the "ALJ") conducted a hearing, at which Macklin appeared with her attorney.  R. at 25.  Macklin and vocational expert Timothy Bobrowski ("Bobrowski") testified.  R. at 26.  On April 11, 2008, the ALJ issued a decision denying Macklin benefits on the ground that there were a significant number of jobs in the national economy that Macklin could perform despite her impairments.  R. at 11-24.  The Appeals Council denied Macklin's request for review.  R. at 4.

### A.  PHYSICAL IMPAIRMENTS

Macklin has suffered from asthma since childhood, and uses inhalers and nebulizers several times a day.  R. at 227, 232.  She has been hospitalized various times over the years for asthma complications, most recently in 1998.  R. at 227.

#### 1.  Medical Evidence of Record

On October 7, 2004, a spirometry report ordered by Macklin's primary care physician, Dr. Robert C. Cater ("Dr. Cater"), showed FVC and FEV1 readings of forty-one and thirty-six percent, respectively, indicating a severe airway obstruction and low vital

---

[1] Supraventricular tachycardia is a rapid heartbeat originating in the upper chambers of the heart, "conventionally applied to rates over [ninety] beats per minute." STEDMAN'S MEDICAL DICTIONARY 1872, 1931 (28th Ed. 2006) ("STEDMAN'S").

capacity.  R. at 319.  Medications improved Macklin's condition slightly for a period of approximately six months.  R. at 307, 313.  After an August 2, 2005, spirometry report again showed a severe obstruction, Dr. Cater referred Macklin to Dr. Ramon S. Dunkin ("Dr. Dunkin") for pulmonary consultation.  R. at 152, 167.  On September 14, 2005, Dr. Dunkin determined that Macklin had a tracheal or central airway obstruction.  R. at 147.  Dr. Dunkin referred Macklin to Dr. Abideen Yekinni ("Dr. Yekinni") for evaluation of her central airways.  *Id.*  An office examination with Dr. Yekinni revealed subglottic and tracheal stenosis.[2]  R. at 160.  On October 13, 2005, Dr. Yekinni performed diagnostic rigid bronchoscopy, diagnostic microlaryngoscopy, and bronchoscopy with laser excision of subglottic and tracheal stenosis.  R. at 160-61.  On October 27, 2005, a binasal sinus CT scan performed at the direction of Dr. Yekinni showed chronic sinusitis[3] and nasal polyposis.[4]  R. at 159.  A November 22, 2005, spirometry report showed a moderately severe obstruction with low vital capacity, but marked improvement with bronchilators; Macklin's post-bronchilator FVC and FEV1 readings were eighty-four and seventy-three percent, respectively.  R. at 186.  On December 22, 2005, Dr. Yekinni performed additional surgery to address the chronic sinusitis and nasal polyposis, consisting of bilateral endoscopic frontal sinusotomy and ethmoidectomy.  R. at 156-58.

---

[2] Tracheal stenosis is a stricture of the trachea, an air tube in the throat. STEDMAN'S at 1832, 2006.

[3] Chronic sinusitis is characterized by persistent inflammation of the mucous membrane of the sinuses.  STEDMAN'S at 376, 1777.

[4] Nasal polyposis is the presence of several masses of inflammatory tissue projecting into the nose from the sinus cavity.  STEDMAN'S at 1537-39, 1281.

Macklin continued to experience chest pain and shortness of breath after her surgeries. She presented to the emergency room three times between October 2006 and December 2007, each time complaining of chest and throat pain or dyspnea. R. at 332, 336, 360.

## 2. Medical Evidence from State Consultants

On August 4, 2005, state agency physician Dr. Iyas K. Sheikh Yousef ("Dr. Yousef") evaluated Macklin and noted impressions of bronchial asthma, depression, and possible Raynaud's phenomenon.[5] R. at 227. During the evaluation, Macklin reported that she started having tachycardias in 1994,[6] and that medication has lessened the frequency with which they occur. *Id.* Macklin stated that she could climb about six steps or walk half a block before needing to stop to catch her breath. *Id.* She also said that she could lift between five and ten pounds and could stand for ten minutes before experiencing dyspnea, but had no problems sitting. *Id.* Dr. Yousef noted that Macklin was alert and cooperative during the examination and exhibited no apparent difficulty or exertional dyspnea[7] while getting on and off the examination table or out of a chair. R. at 228. However, he did note that her inspiratory and expiratory wheezing was audible without a stethoscope. R. at 229.

---

[5] "Raynaud's phenomenon" is an impairment caused by spasm of the digital arteries, which causes "numbness or pain of the fingers, often precipitated by cold." STEDMAN'S at 1478. Persons with Raynaud's phenomenon often present with fingers that are variably red, white, or blue. *Id.*

[6] There is conflicting evidence in the record regarding the onset date of Macklin's supraventricular tachycardia. Macklin's primary care physician, Dr. Cater, noted that the tachycardias started in 2004, while Macklin self-reported that they began in 1994. R. at 149, 227.

[7] Exertional dyspnea is "excessive shortness of breath [that occurs] after exercise." STEDMAN'S at 601.

On December 12, 2005, Dr. A. Lopez ("Dr. Lopez"), a medical consultant, reviewed Macklin's file and completed a physical residual functional capacity assessment. R. at 178-85. Dr. Lopez found that Macklin could frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds because her asthma was under control and she was doing well post-surgery. R. at 179. He also found that Macklin could stand or walk for a total of six hours in an eight-hour workday, and could sit for about six hours in an eight-hour workday. *Id.* Dr. Lopez cautioned that Macklin should avoid concentrated exposure to dust, gases, fumes, odors, or poor ventilation. R. at 182. He further noted that Macklin's stated symptoms, their severity, and the effect that they had on her ability to function were credible and consistent with the available medical and nonmedical evidence. R. at 183.

### B. MENTAL IMPAIRMENTS

In addition to her physical impairments, Macklin has a history of depression and anxiety, and has sought therapy on various occasions. R. at 241, 362, 384, 410. Macklin has also attempted suicide several times. R. at 233, 349, 433, 458.

#### 1. Medical Evidence of Record

In December 2003, Macklin was hospitalized for three days after overdosing on thirty sleeping pills. R. at 233, 239-40. On November 17, 2004, a clinician at Community Hospital diagnosed Macklin with dysthmic disorder, providing a Global Assessment of Functioning ("GAF")[8] score of 58. R. at 362. Macklin attended individual therapy on

---

[8] GAF is a measurement of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Rev. 2000). It represents "the clinician's judgment of the individual's overall level of functioning." *Id.* A GAF score between 51 and 60 indicates moderate symptoms, such as flat affect and occasional panic attacks, or moderate difficulties with social, occupational, or school functioning. *Id.*

5

December 1, 2004, but failed to keep any of her other therapy appointments, and her case was closed. R. at 380. On May 11, 2005, Macklin again went to Community Hospital, and her diagnosis was changed to major depressive disorder. R. at 384. At that time, Macklin's assessed GAF was 43.[9] *Id.* Macklin's therapy was once more terminated after compliance issues and several missed appointments. R. at 388-93. On May 24, 2005, Macklin sought therapy through Gallahue Mental Health Services, but therapy was terminated in June 2005, after intermittent attendance. R. at 408.

On February 1, 2006, Macklin once again sought assistance from Community Hospital for her depression, anxiety, and insomnia. R. at 410. After a psychiatric evaluation by Dr. Magdoline Daas ("Dr. Daas"), Macklin was diagnosed with recurrent major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia. R. at 420. Dr. Daas recommended that Macklin participate in individual and group therapy on a weekly basis. *Id.* The record shows that Macklin only attended individual therapy twice. R. at 422, 430. Thereafter, Macklin failed to keep any further therapy appointments, and her case was closed on August 23, 2006. R. at 430.

On August 13, 2007, Macklin attempted suicide by cutting herself after a fight with her boyfriend. R. at 433. A week later, on August 20, 2007, she sought care from Community Health for her depression. R. at 431. After evaluation, Macklin was diagnosed with recurrent and moderate major depressive disorder. R. at 435. At her first therapy

---

[9] A GAF score between 41 and 50 indicates severe symptoms, such as suicidal ideation, or serious impairment in social, occupational, or school functioning. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Rev. 2000).

session, Macklin explained that she had previously stopped attending sessions due to loss of her insurance, but that the problem had been remedied. R. at 437. After Macklin missed several subsequent appointments, her therapist noted that Macklin has a tendency to only attend intake and transfer therapy sessions, and seems to present solely to obtain medication. R. at 454. On October 29, 2007, Macklin's case was closed for noncompliance. R. at 456.

On November 20, 2007, Macklin was transported via ambulance to the emergency room at Wishard Memorial Hospital after an automobile accident. R. at 458-60. Macklin only suffered minor injuries and was released from the hospital the following day. R. at 460. The ambulance report stated that Macklin struck a pole on the passenger side of her car while traveling at approximately thirty miles per hour. R. at 458. She had alcohol in her system. *Id.* Macklin characterized the automobile accident as a suicide attempt, stating that she overdosed on sleeping pills and purposely drove her car into the pole. R. at 33, 349.

On December 12, 2007, Macklin was hospitalized after attempting suicide by ingesting over thirty sleeping pills, and was discharged the next day. R. at 349, 352. Macklin stated that she simply wanted to fall asleep and never wake up. R. at 351. She also reported that she had recently stopped her therapy at Gallahue after losing her insurance. R. at 352.

### 2. Medical Evidence from State Consultants

On August 3, 2005, a psychological evaluation performed by state agency psychologist Suzanne Leiphart, PhD, HSPP ("Dr. Leiphart"), resulted in a diagnosis of major depression in partial remission with a GAF of 51. R. at 235. During the evaluation,

Macklin reported that she was attending counseling at Gallahue for assertiveness training and other related classes, but admitted that she did not attend therapy sessions on a regular basis. R. at 231. She stated that she did not like to speak in group therapy due to discomfort in group situations. R. at 231, 235. Macklin also stated that she had been taking classes at Martin University, but had stopped going because being in a classroom with twenty-eight other students made her anxious and uncomfortable. R. at 233. Dr. Leiphart observed that Macklin's mood during the evaluation was anxious, and her affect was restricted at times, noting, "[Macklin] appeared more anxious than depressed." *Id.* Dr. Leiphart observed that Macklin was cooperative and oriented throughout the evaluation, and her thought content was logical and sequential. *Id.*

On September 26, 2005, Dr. James Gange ("Dr. Gange"), a non-examining medical consultant, completed a mental residual functional capacity assessment and determined that Macklin has mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had not experienced any episodes of decompensation.[10] R. at 218.

### C.  THE HEARING BEFORE THE ALJ

Macklin was thirty-five years old at the time of the hearing before the ALJ. R. at 78. At the hearing, Macklin testified that she stopped working her last job as a self-employed receptionist for a masseuse because the presence of several cats in the office exacerbated

---

[10] An "episode of decompensation" is an "exacerbation[] . . . in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. § 404, Supbart P, Appx. 1 at 12.00(C)(4). "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.*

her asthma. R. at 32. She testified that the October 2005 surgery performed by Dr. Yekinni alleviated the wheezing in her throat but did not help with her asthma problems. R. at 32-33.

Macklin stated that her most recent suicide attempt was in December of 2007, but that she has had three other suicide attempts. *Id.* Specifically, Macklin testified that she overdosed in December of 2003, slit her wrists in April or June of 2007, and purposely ran her car into a tree in November of 2007. R. at 33. When the ALJ asked Macklin what precipitated her suicidal ideations, she replied that caring for her disabled daughter was stressful, but she never planned to commit suicide; rather, "it kind of just happened." R. at 36. In response to the ALJ's inquiry as to why she has a history of missing therapy appointments, Macklin stated that she has had problems with her insurance. R. at 37. She also stated, "I never really felt like I was from my point of view depressed or stressed to the point where I needed to see a psychiatrist." R. at 38. Macklin felt that she could alleviate stress by making changes to her daily routine and relationships rather than through therapy. *Id.*

Macklin testified that she takes her daughter to doctor and dentist appointments. R. at 41. She also stated that her son does the grocery shopping. R. at 42. Macklin testified that taking a shower or speaking for more than fifteen minutes causes her to become short of breath. R. at 47-48. She testified that she feels anxious and irritable when in a room with other people, even just watching television with her son. R. at 43-44, 48-49. She stated that she spends most of her time alone in her bedroom. R. at 43. When the ALJ asked her whether she would have to miss work on days that she stays in bed,

Macklin responded affirmatively. *Id.* She estimated that she stays in bed all day more than two days a week. *Id.*

Macklin testified that she had been hospitalized four times in the past year for complications related to her asthma. R. at 44. She stated that temperature extremes, dust, animals, laughing, and crying trigger her asthma. R. at 47. She also testified that her tracheal stenosis interferes with her breathing. R at 44. Finally, Macklin testified that she has heart problems that cause her heart to beat rapidly upon exertion, sometimes leading to blackouts. R. at 45. Macklin stated that she could stand for between thirty and forty minutes or walk about half a block before she became short of breath and would have to use her inhaler. R. at 46. She estimated that she could lift, at most, about ten pounds, and said that she could not lift any amount of weight repeatedly. R. at 47.

Bobrowski, the vocational expert, testified that Macklin's prior work history included jobs as a cashier, bakery clerk, nursing assistant, home health aide, and receptionist. R. at 52-53. Bobrowski characterized Macklin's prior work history as ranging from unskilled to semiskilled sedentary to heavy work. *Id.* The ALJ asked Bobrowski to consider a hypothetical individual of Macklin's age, educational background, and work experience, who could lift and carry up to twenty pounds occasionally and ten pounds frequently. R. at 53. The individual could stand and walk for six hours of an eight-hour workday and sit for about six out of eight hours. *Id.* She needed to work in a clean atmosphere with no concentrated exposure to dust, fumes, gases, strong odors, or poor ventilation, and needed to avoid temperature extremes or excessive humidity. *Id.* Further, the hypothetical individual could only perform work that was routine and repetitive with no unusually strict time or production quotas. *Id.* She required no interaction with the general public, and only

superficial contact with co-workers.  *Id.*  Bobrowski testified that a hypothetical individual with Macklin's vocational profile and the limitations described by the ALJ could not perform any of Macklin's past work.  *Id.*  Bobrowski further testified that such an individual could perform light work as an inspector, hand packer, or clerical sorter.  R. at 53-54.  Bobrowski stated that there are 6,000; 10,000; and 2,000 such jobs in Indiana, respectively.  R. at 54.  He also testified that there would be no jobs in the national economy that an individual with the hypothetical limitations proposed by the ALJ could perform if the individual required two to four days of absence from work on a monthly basis because of exacerbation of depression and anxiety symptoms.  R. at 54-55.  Finally, if limited to sedentary work, lifting and carrying no more than ten pounds occasionally and five pounds frequently, Bobrowski testified that an individual with Macklin's vocational profile could be employed as a sedentary inspector, hand packer, or clerical sorter.  *Id.*  Bobrowski revealed that there are 1,000; 2,000; and 1,000 such jobs in Indiana, respectively.  *Id.*

## II. **DISABILITY AND STANDARD OF REVIEW**

To be eligible for SSI, a claimant must have a disability as that term is defined in the Social Security Act.  Specifically, a disability is "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  In order to constitute a disability, the medical or physical impairment(s) must be of such severity that the individual is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).  The alleged physical or mental impairments must be supported by medically determinable evidence.  20 C.F.R. § 416.908.

In determining whether a claimant is disabled, the ALJ applies a five-step sequential evaluation process set forth by the Social Security Administration.  20 C.F.R. § 416.920(a)(4).  Specifically, the ALJ must consider and determine whether:

1. The claimant is employed in substantial gainful activity;

2. The claimant has a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement set forth in the regulations;

3. The claimant has an impairment that satisfies the duration requirement and meets or equals any of those impairments listed in the regulations that automatically require a finding of disability;

4. The claimant can still perform past relevant work given her residual functional capacity; and

5. The claimant is unable to perform other work given her residual functional capacity, age, education, and experience.

*Id.*  The burden of proof is on the claimant for the first four steps of the sequential evaluation process, and shifts to the Commissioner at the fifth and final step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992) (citing *Ray v. Bowen*, 843 F.2d 998 (7th Cir. 1988)).

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. § 1383(c)(3).  When the Appeals Council denies a claimant's timely request for review, the ALJ's decision becomes the final decision of the Commissioner.  20 C.F.R. § 416.1481; *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C.

§ 1383(c)(3) (incorporating judicial review provisions of 42 U.S.C. § 405(g)); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992)).  A reviewing court may not substitute its judgment for that of the ALJ, nor may it decide facts anew or reweigh evidence.  *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (citing *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)).  While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz*, 55 F.3d at 305 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III. DISCUSSION

### A. THE ALJ'S FINDINGS

The ALJ began the five-step sequential evaluation process by finding that Macklin has not engaged in substantial gainful activity since April 21, 2005, the date of her SSI application.  R. at 16.  At the second step, the ALJ determined that Macklin has severe impairments consisting of "asthma, tachycardia, depression and anxiety."  *Id.*  At the third step, the ALJ found that Macklin's impairments, singularly or combined, do not meet or exceed any of the impairments in the Listing of Impairments that requires a finding of disability.  R. at 16.  The ALJ found that Macklin's anxiety and depression cause mild restrictions in daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. at 17.  Further, the ALJ found that Macklin has experienced one or two episodes of decompensation.  *Id.*  Prior to proceeding to the fourth step, the ALJ determined Macklin's residual functional capacity ("RFC").  Based on the evidence in the record, including

objective medical evidence and opinion evidence as to Macklin's symptoms, the ALJ found that Macklin:

> [Is] limited to lifting, carrying, pushing or pulling [twenty] pounds occasionally and [ten] pounds frequently. She can stand and walk [six] hours in an [eight] hour day, and can sit [six] hours in an [eight] hour day. She should work in a clean air atmosphere with no concentrated exposure to dust, fumes, gases, strong odors or poor ventilation. She should not work in areas of temperature extremes or excessive humidity. She is limited to work involving only routine, repetitive tasks. She should not be required to meet unusually high strict time or production quotas. She should have no contact with the general public and only occasional contact with coworkers.

R. at 18. At the fourth step, the ALJ concluded that Macklin is unable to perform any past relevant work. R. at 23. Finally, at the fifth step, the ALJ concluded there are a substantial number of jobs in the national economy that Macklin could perform given her RFC. R. at 23-24.

### B. MACKLIN'S ARGUMENTS ON APPEAL

Macklin asserts three arguments on appeal, but the Court need only consider the first. Macklin contends that the ALJ failed to consider all of the objective medical evidence in determining that her impairments do not meet or equal the requirements of Listings 12.04 or 12.06. Specifically, she argues that the ALJ failed to articulate why he afforded more weight to the state-ordered consultative examinations than he did to the evidence obtained in the two-and-a-half years between the consultative examinations and Macklin's hearing.

At the third step of the sequential evaluation process, if the ALJ finds that a claimant's impairments meet or equal an impairment found in the Listing of Impairments, a finding of disability is required. 20 C.F.R. § 416.920(a)(4)(iii). "In considering whether a claimant's medical condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v.*

*Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Id.* at 670 (citing 20 C.F.R. § 404.1526(b)). Although an ALJ is not required to address in writing every piece of evidence presented, *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984), he must "minimally articulate[ ] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)) (internal citations omitted). Articulating the rationale for rejecting competent evidence is all the more important in cases where "considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. "All medical evidence that is credible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ." *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984).

In *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998), the ALJ relied entirely on a non-examining consultant's report to support his decision that the claimant did not have an impairment that met or equaled a listing pertaining to back conditions. *Id.* In doing so, the ALJ failed to mention evidence from the claimant's treating neurologist, which contradicted the non-examining consultant's findings. *Id.* The *Groves* court held that "[t]he [ALJ's] failure . . . to mention the competent medical evidence that went contrary to [the non-examining consultant's] opinion made the . . . explanation for his decision to deny benefits unacceptable." *Id.*

The ALJ's oversight in Macklin's case is identical to that of the ALJ in *Groves.* While the ALJ specifically mentioned that he considered Macklin's depression and anxiety under Listings 12.04 and 12.06, he ignored evidence from Macklin's treating physicians, which

tended to support the assertion that Macklin's impairments meet or equal a listed impairment.

To support his decision that Macklin's impairments do not meet or equal the "Paragraph B" or "Paragraph C" requirements of Listing 12.04, the ALJ referenced the results of Dr. Leiphart's August 3, 2005, consultative psychological examination. R. at 17. Specifically, the ALJ used Dr. Leiphart's report to support his finding that Macklin has only mild restrictions in daily living, moderate difficulties with social functioning, and moderate difficulties with concentration, persistence, or pace. *Id.* The ALJ then summarily stated, without explanation, that Macklin had experienced "one to two episodes of decompensation." *Id.*

The ALJ mentioned Macklin's suicide attempts and mental health treatment history in his written decision, but only in connection with his RFC assessment. Specifically, the ALJ noted that Macklin had presented for mental health treatment on at least three occasions. R. at 21. He also conceded that "[t]he medical evidence shows some . . . attempts at suicide." *Id.* Even then, the ALJ merely glossed over the incidents, characterizing them as "alleged" suicide attempts. *Id.*

As discussed above, the ALJ relied exclusively on Dr. Leiphart's psychological evaluation in making the determination that Macklin's impairments do not meet or equal a listed impairment. Yet competent medical evidence in the record pertaining to Macklin's suicide attempts and mental health treatment could support a conclusion that she experienced the requisite number of episodes of decompensation and suffered from

16

"marked" restrictions in one or more of the areas of daily living; social functioning; or maintaining concentration, persistence, or pace.

The record reveals that Macklin received mental health treatment for her depression and anxiety from Community Hospital in February 2006, and again in August 2007, a week after attempting suicide. During the intake assessments for this treatment, Macklin was assigned GAF scores of 41 and 48, respectively, both of which indicate severe impairments in social, occupational, or school functioning. The record also shows that Macklin was hospitalized in November and December 2007, for injuries related to attempted suicide; first by purposely driving her car into a pole, and then by overdosing on sleeping pills. None of these suicide attempts, nor the medical records from Macklin's admissions for mental health treatment, were mentioned in the ALJ's written decision that Macklin's impairments do not meet or equal Listings 12.04 or 12.06.

The intake report from February 1, 2006 indicates that Macklin was only sleeping two to four hours per night, had not been to the grocery store for two months, skipped nursing school classes due to fear of being in groups, had difficulty concentrating, and avoided leaving the house. R. at 410, 419. This evidence could support a finding of marked difficulties with performing daily living activities and maintaining persistence, concentration, or pace. Further, the ALJ failed to mention the notation in Dr. Leiphart's report that Macklin dropped out of school because she could not handle being in a classroom with a group of people, or the finding during an August 20, 2007 mental health evaluation that Macklin "cannot tolerate group [therapy]." R. at 233, 435. This evidence could support a finding of marked difficulties with maintaining social functioning. Such a

finding would also be supported by Macklin's frequent episodes of remaining in bed for days at a time.

Multiple suicide attempts could meet the decompensation requirement for Listings 12.04 or 12.06, which contain the same criterion. The decompensation requirement in Listing 12.04 requires that a claimant experience repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, Appx. 1. This means that a claimant must have at least three episodes of decompensation in a one-year time period, each lasting at least two weeks. *Id.* More frequent episodes of shorter duration can also meet the decompensation requirement "if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

Thus, even if each episode of decompensation did not last the requisite two weeks, the fact that Macklin had more than three suicide attempts could, in the judgment of a medical advisor, be medically equivalent to three episodes of decompensation in a year with a duration of two weeks each. However, the ALJ "simply assumed the absence of equivalency without any relevant discussion. That assumption cannot substitute for evidence and does not support the decision to deny benefits."[11] *Barnett*, 381 F.3d at 671.

Had the ALJ properly considered all of the available medical evidence of record, he could have found that Macklin's impairments meet or equal at least two of the "Paragraph

---

[11] The Court would reach the same conclusion, even if the November 2007 automobile accident were not characterized as a suicide attempt. As discussed above, the competent medical evidence could support a finding that Macklin's impairments meet or equal the "Paragraph B" requirements without resorting to an analysis of episodes of decompensation.

B" criteria for Listings 12.04 or 12.06.  Of course, once he considered this evidence, the ALJ could have gone either way.  But consider it he must.  Accordingly, the Court concludes that the ALJ's determination that Macklin's impairments do not meet or equal a listing is not supported by substantial evidence.

### IV.  CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of Social Security in this case is **REMANDED**.

IT IS SO ORDERED this 30th day of March, 2010.

_____<br>
LARRY J. McKINNEY, JUDGE<br>
United States District Court<br>
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net